No. 15-15448

---

UNITED STATES COURT OF APPEALS
FOR THE
NINTH CIRCUIT

---

**JON E. FRUDDEN,** on behalf of his minor children,
**JOHN DOE AND JANE DOE,**
Plaintiffs-Appellants,

vs.

**KAYANN PILLING,** the **ROY GOMM ELEMENTARY SCHOOL PARENT-FACULTY ASSOCIATION, INC., HEATH MORRISON, LYNN RAUH,** the **WASHOE COUNTY SCHOOL DISTRICT**,

Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
Case No. 3:11-cv-00474-RCJ-WCG
The Honorable Robert C. Jones

---

**APPELLANTS' OPENING BRIEF**

---

Mary L. Frudden, Esq.
1902 Carter Dr.
Reno, NV 89509
(775) 324-7078
maryfrudden@sbcglobal.net
*Attorney for Plaintiffs-Appellants*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF JURISDICTION ............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE ..................................................................... 1

    PROCEDURAL HISTORY ................................................................... 1

        STATEMENT OF FACTS ............................................................... 4

SUMMARY OF ARGUMENT .................................................................... 8

STANDARD OF REVIEW ....................................................................... 10

ARGUMENT ............................................................................................. 11

I.      CONTENT- AND VIEWPOINT BASED SPEECH REGULATION IS PRESUMED UNC

**II.    THE SCHOOL AUTHORITIES DID NOT DEMONSTRATE THE COMPELLED MOTTO "TOMORROW'S LEADERS" SERVED A COMPELLING GOVERNMENT INTEREST BY A NARROWLY TAILORED MEANS ................................................................ 14**

III.   THE SCHOOL AUTHORITIES DID NOT DEMONSTRATE THE CONTENT-BASED EXEMPTION FOR UNIFORMS OF A NATIONALLY RECOGNIZED YOUTH ORGANIZATION SERVED A COMPELLING GOVERNMENT INTEREST BY THE LEAST RESTRICTIVE MEANS .......................................................... 17

**IV.   THE SCHOOL AUTHORITIES DID NOT DEMONSTRATE THE CONTENT- AND VIEWPOINT BASED REGULATION SERVED A COMPELLING GOVERNMENT INTEREST BY THE LEAST RESTRICTIVE MEANS ........................................................ 22**

A.     THE EVIDENCE UNEQUIVOCALLY ESTABLISHED CONTENT- AND VIEWPOINT BASED REGULATION ............................................... 22

B.     THE DISTRICT COURT ERRED IN DETERMINING THE POLICY AND UNIFORMS WERE CONSTITUTIONAL ......................... 28

     1.     No Compelling Government Interest Identified by the School Authorities **.........................................................................** 29

2.  The District Court Erred in Finding their Were "Actual Problems" in "Need of Solving."32

     3.     Determination of Narrowly Tailored…………………………38

V.     THE FRUDDENS' COMPELLED SPEECH CLAIM REGARDING SCHOOL UNIFORMS IN GENERAL .................................................... 47

     **VI.**     **QUALIFIED IMMUNITY IS NOT AVAILABLE………………………..54**

**VII.**     **ATTORNEY'S FEES SHOULD BE ALLOWED TO THE FRUDDENS AS A PREVAILING PARTY ............................................................. 57**

VIII.  THE COURT ABUSED ITS DISCRETION IN EXCLUDING THE FRUDDENS' EVIDENCE ........................................................................ 58

CONCLUSION ................................................................................................ 61

STATEMENT OF RELATED CASES ........................................................... 62

CERTIFICATE OF COMPLIANCE ............................................................... 63

CERTIFICATE OF SERVICE ........................................................................ 64

# TABLE OF AUTHORITIES

## Cases

*Abood v. Detroit Bd. of Ed.*, 431 US 209 (1977)................................................46

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)..............................................22

*A.M. ex rel. McAllum v. Cash*, 585 F.3d 214 (5th Cir. 2009)................................36

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010).....................52

*Anderson v. Creighton*, 483 U.S. 635 (1987)......................................................54

*Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S.Ct. 2074 (2011)...........................54, 55

*Bethel School Dist. No. 403 v. Fraser*, 478 U. S. 675 (1986)...............................13

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005).............30, 32, 33

*Board of Regents of Univ. of Wis. System v. Southworth*,
529 U.S. 217 (2000)..............................................................................27

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. ___, 131 S.Ct. 2729 (2011)..............................................passim

*Buckley v. Valeo*, 424 U.S. 1 (1976)..................................................................41

*Burson v. Freeman*, 504 U.S. 191 (1992).........................................................11

*Butts v. Dallas Indep. Sch. Dist.*, 436 F.2d 728 (5th Cir.1971)............................37

*Carey v. Brown*, 447 U.S. 455 (1980)...............................................................21

*Carey v. Piphus*, 435 U.S. 247 (1978)..............................................................22

*Carmen v. San Francisco Unified School District*,
237 F.3d 1026, 1028-29 (9th Cir.).............................................................60

*Celotex v. Catrett*, 477 U.S. 317 (1986)......................................................21, 60

iv

*Church of Am. Knights of the Ku Klux Klan v. Kerik*,
356 F.3d 197 (2nd Cir. 2004) ........................................................................ 48

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ...................................................................................... 42

*Collins v. Chandler Unified School Dist.*,
644 F.2d 759 (9th Cir. 1981) ........................................................................ 58

*Colorado Republican Federal Campaign Comm. v.*
*Federal Election Comm'n*, 518 U.S. 604 (1996) .......................................... 42

*Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530 (1980) ........ 34

*Crosby by Crosby v. Holsinger*, 852 F.2d 801 (4th Cir. 1988) ........................ 49

*Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004) .................................................... 49

*Cummings v. Connell*, 402 F.3d 936 (9th Cir. 2005) ........................................ 22

*DeBoer v. Pennington*, 206 F.3d 857, 865 (9th Cir. 2000), petition for cert. filed,
(U.S. Aug. 7, 2000) (No. 00-222) ................................................................ 55

*Devereaux v. Abbey*, 263 F.3d 1070 (2001) .................................................... 57

*DiMartino v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark*, .......................... 58, 59

*Ellins v. Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013) .................................... 11

*Elrod v. Burns*, 427 U.S. 347 (1976) .............................................................. 46

*Ferrell v. Dallas Indep. Sch. Dist.*, 392 F.2d 697 (5th Cir. 1968) ............... 29-31

*Forsyth County v. The Nationalist Movement*, 505 U.S. 123 (1992) ............... 26

*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003) .......................................... 60

*Frudden v. Pilling*, 842 F.Supp.2d 1265 (D.Nev. 2012) .................................... 2

*Frudden v. Pilling*, 742 F.3d 1199 (9th Cir. 2014) ................................... passim

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ...................................................11

*Giebel v. Sylvester*, 244 F.3d 1182 (9th Cir. 2001)............................................55

*Grutter v. Bollinger*, 539 U.S. 306 (2004).............................................passim

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
896 F.2d 1542, 1551 (9th Cir.1990)......................................................60

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ......................................................54

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ......................................................57

*Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001)...................................27

*Huey v. Honeywell, Inc.*, 82 F.3d 327 (9th Cir. 1996).......................................21

*Hurley v. Irish-American Gay, Lesbian and Bisexual
Group of Boston, Inc*., 515 U.S. 557 (1995)..............................................53

*Jacobs v. Clark County School Dist*., 526 F.3d 419 (9th Cir. 2008) .........................passim

*Jacobs v. Clark County School Dist*.,
373 F.Supp.2d 1162 (D.Nev. 2005).......................................................42

*Kay v. Ehrler*, 499 U.S. 432 (1991) ...........................................................10, 57

*Koerner v. Grigas*, 328 F.3d 1039 (9th Cir. 2003) ......................................16, 18

*Lockwood v. Wolf Corp*., 629 F.2d 603 (9th Cir. 1980) ....................................59

*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000) .................................................10

*Maffei v. N. Ins. Co*., 12 F.3d 892 (9th Cir. 1993)..............................................11

*Maljack Productions, Inc. v. GoodTimes Home Video Corp.*,
81 F.3d 881, 889 (9th Cir. 1996) .....................................................60, 61

*Mine Workers v. Illinois Bar Assn.*, 389 U.S. 217 (1967) .................................34

vi

*Monterey County Democratic Central Committee v.*
*United States Postal Service*, 812 F.2d 1194 (9th Cir. 1987)...............................12

*Morgan v. Swanson*, 659 F.3d 359, 386 (5th Cir. 2011) .....................................55

*Morgan v. Swanson*, No. 11-804, at 13 (U.S. Jan. 26, 2012) ...........................55

*Nissan Fire v. Fritz*, 210 F.3d 1099 (2000) .......................................................22

*Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002)...............................61

*Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 98–99 (1972) ..............................21

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996)........................................16, 18

*Quincy Cable TV, Inc. v. F.C.C.*, 768 F.2d 1434 (D.C.Cir. 1985) ....................32

*R.A.V. v. St. Paul,* 505 U.S. 377 (1992) ..............................................11, 13, 28

*Rickley v. Cty of Los Angeles*, 654 F.3d 950 (9th Cir. 2011)............................58

*Riley v. Nat'l. Fed'n.of the Blind of N.C.*, 487 U.S. 781 (1988).................. 12, 54

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ...........................................29, 30

*Rosenberger v. Rector and Visitors of the University of Virginia*,
515 U.S. 819 (1995).............................................................................................12

*Rounds v. Or. State Bd. of Higher Educ.,* 166 F.3d 1032 (9th Cir. 1999)...................43, 52

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
547 U.S. 47 (2006)...............................................................................................56

*Santa Fe I.S.D. v. Doe*, 530 U.S. 290 (2000)....................................................27

*Sorrell v. IMS Health Inc.,* ___ U.S. ___, 131 S.Ct. 2653 (2011).....................44

*Texas v. Johnson*, 491 U.S. 397 (1989) ............................................................12

vii

*Tinker v. Des Moines Independent Community School Dist.*,
393 U.S. 503 (1969) ................................................................................ passim

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) .................... 11, 12, 32, 33

*United States v. Burreson*, 643 F.2d 1344 (9th Cir. 1981),
*cert. den'd*, 454 U.S. 830, 847 (1981) ............................................................ 11

*United States v. Kokinda*, 497 U.S. 720 (1990) .............................................. 12

*United States v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000) ................................................................................ passim

*Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 417 (3d Cir. 2003) ............... 55

*Weissberg v. Lancaster School Dist.*, 591 F.3d 1255 (9th Cir. 2011) ................................ 58

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943) ........................................................................ 12, 43, 47, 55

*White v. New Hampshire Dept. of Employment Security*,
455 U.S. 445 (1982) ...................................................................................... 57

*Winters v. New York*, 333 U.S. 507 (1948) ...................................................... 53

*Wooley v. Maynard*, 430 U.S. 705 (1977) .................................................. passim

**Statutes**

28 U.S.C. §1291 ............................................................................................. 1

28 U.S.C. §1331 ............................................................................................. 1

42 U.S.C. §1983 ............................................................................................. 1

42 U.S.C. §1988 ..................................................................................... passim

NRS 388.121 *et seq.* ...................................................................................... 41

NRS 392.915 .............................................................................................. 41

## Rules of Civil Procedure

Fed.R.Civ.P. 15(b) ....................................................................................... 3

Fed.R.Civ.P. 15(d) ....................................................................................... 3

Fed.R.Civ.P. 56 ...................................................................................... 17, 58

## Federal Rules of Evidence

FRE 901 .................................................................................................. 59, 61

FRE 902 ....................................................................................................... 61

## Washoe County School District Policies and Regulations

Board Policy 5105 .......................................................................................... 8

Administrative Regulation 5105 ..................................................................... 8

## Other Authorities

"Nazi Propaganda," Professor David Welch http://www.bbc.co.uk/history/
worldwars/wwtwo/nazi_propaganda_gallery_03.shtml last updated 2011-02-17
accessed 16 June, 2015 ................................................................................ 53

6 Moore's Federal Practice ¶ 56.22[1] (2d ed. 1980) ..................................... 59

Webster's Third New Inter'l Dict. (1986) ................................................. 27, 49

10A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure
§ 2722 (2d ed. 1983) ..................................................................................... 59

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this matter under 28 U.S.C. §1331, because this case involves a federal question: whether school uniform policy violates the First and Fourteenth Amendments and is brought under 42 U.S.C. §1983. This Court has jurisdiction under 28 U.S.C. §1291 because the appeal is from the February 10, 2015 order granting defendants' summary judgment and judgment which disposed of all parties' claims. The Notice of Appeal was timely filed March 10, 2015, ER 1-4.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

Whether the school authorities' summary judgment evidence established an actual problem of bullying and plateauing test scores that needed solving at a public school and that the mandatory school uniform, including the motto "Tomorrow's Leaders," and policy were necessary to the solution?

## STATEMENT OF THE CASE

## I.    PROCEDURAL HISTORY

Mary and Jon Frudden filed a Complaint on July 6, 2011 and a First Amended Complaint (FAC) on October 18, 2011pursuant to 42 U.S.C. §1983 asserting violations of federal and state law, including violations of their two minor children's First Amendment rights. ER 533,513. Throughout this litigation, they have claimed the Roy Gomm Elementary School's (RGES) uniform policy

1

violated First Amendment rights to free speech because it was unconstitutional both by what it restricts and what it compels.  ER 51-54,450-451,515-516.

The Frudden students protested the policy by wearing regular (non-uniform) clothes, uniforms of the American Youth Soccer Organization (AYSO), the RGES uniform shirt inside out, and a written message ("Say No to Uniforms!!").  ER 445,445.  The students were disciplined and threatened with out-of-school suspension for violations of the policy.  ER 422,448.

The district court dismissed the FAC.  *Frudden v. Pilling*, 842 F.Supp.2d 1265 (D.Nev. 2012) and the Fruddens appealed to this Court.  After oral arguments, this Court reversed finding the policy compelled students to bear the government's message of "Tomorrow's Leaders" on the uniform and contained a content-based exemption for nationally recognized youth organizations.  *Frudden v. Pilling*, 742 F.3d 1199, 1208 (9th Cir. 2014).  It remanded for strict scrutiny review.  *Id*.

On remand, the court ordered the Fruddens to file, and they did file, a second amended complaint (SAC) consisting only of the second cause of action in the FAC and directly related allegations.  ER 30-36,437-454,515-520. The Answer was filed; qualified immunity was not raised.  ER 413,427-429.

The school authorities moved for clarification on whether there was a constitutional claim for school uniforms and the adoption of school uniforms "in

2

general." ER 410-412. The Fruddens opposed the motion. ER 399-409. The district court granted the motion to clarify, stating: "the only claims pending before the Court after remand are the claims based on: (1) the motto; and (2) the exemption for nationally recognized organizations. The claim based on the bare fact of the uniforms was not preserved on appeal (and was in fact conceded at oral argument), and it is therefore not before the Court after remand." ER 27.

The Fruddens moved for leave to file a Third Amended Complaint pursuant to Fed.R.Civ.P. 15(b) and to supplement the pleadings pursuant to Fed.R.Civ.P. 15(d). ER 386-390. The district court denied the Fruddens' motion in its entirety. ER 24A-24C.

On December 15, 2014, the school authorities moved for summary judgment (hereafter MSJ). ER 242-385. The Fruddens cross-moved for summary judgment, and opposed, ER 212-241, and moved to strike portions of the MSJ affidavits, ER 62-77, as well as the school authorities' MSJ Reply evidence. ER 525.

The district court granted the school authorities' MSJ, addressed the Fruddens' Motion for Clarification, denied the motion to strike the affidavit testimony and granted the motion to strike the school authorities' MSJ Reply evidence. ER 6-24.

## II.   STATEMENT OF FACTS

WCSD is a political subdivision of the State of Nevada and administers a portion of the state system of public education.  ER 438,414.  KayAnn Pilling was employed by WCSD as the principal of RGES.  *Id*.  Heath Morrison, Ph.D. was the school superintendent for the WCSD employed by its BOT.  *Id*.  Lynn Rauh was an employee of WCSD as an Area Superintendent for the Office of School Performance.  *Id*.  At the time the original complaint was filed, the Frudden students were enrolled at RGES, a WCSD school.   ER 439,415.

RGES is partly supported by the Roy Gomm Elementary School Parent-Faculty Association, Inc. (PFA), a private, non-profit Nevada corporation.  ER 274-276.  The PFA campaigned in 2009 to implement mandatory school uniforms at RGES.  ER 440,416.  The former PFA president, Mimi Butler, attested she "thought, and then suggested to other members of the PFA, that school uniforms may help students learn how to 'dress for success' and focus on schoolwork rather than their clothing." ER 278.  Butler "noticed that, although many of the students at Roy Gomm Elementary School were from wealthy households, there were some students that could not afford expensive clothing."  ER 278-279.  She "thought school uniforms would help even the playing field for those students who could not afford expensive clothes and, consequently, keep them focused on school rather than what other students were wearing."  ER 279.

4

The PFA allowed each RGES family one vote and required two-thirds majority of returned ballots in favor of school uniforms to pass the initiative. *Id.* The measure failed. *Id*.

Pilling attested RGES's on-going special education program had a "large percentage" of students "on a free and reduced lunch program;" the "school within a school" ("SWAS") at RGES "drew students from all of school zone Area 1, which spanned out to Sun Valley, Nevada;" and RGES was a Title I receiver school which gave "students who were zoned for a Title I school" "the option to transfer to and attend" RGES. ER 292. She "anticipated" RGES "would have a more socioeconomically diverse student body in 2010-2011 than in years past" and, "[b]ased on this, in addition to boosting test scores, [she] believed school uniforms would help even the playing field and prevent potential bullying against the new students whose families may not be able to afford some of the expensive clothing worn by their peers." *Id*. Pilling appointed a PFA "uniform committee" "to gather information and educate the parents about the proposed dress code." ER 293.

Dina Hunsberger, the PFA's vice-president and chairperson of the uniform committee, attested she "believed" uniforms would "boost test scores" and "would help even the playing field and prevent potential bullying against the new students

whose families may not be able to afford some of the expensive clothing worn by their peers." ER 283.

After a fashion show and presentation, the PFA put the matter to vote again in May 2011. *Id*. The measure reportedly passed with over 66% in favor of uniforms. ER 293,181.

Pilling, the PFA and uniform committee participated in drafting the written policy including the exemption, and decided to include the school name and mascot (gopher) together identified as the "RGES logo" and motto "Tomorrow's Leaders" on the shirt. ER 445,420,333,246.

Evidence verified by Butler demonstrates students were required to buy the RGES uniform shirt with the RGES logo to prevent the purchase of expensive brand name polos which may lead to "social cliques, bullying and concentration on clothing brands rather than school work." ER 347.

The policy describes its "main purpose" as "to establish a culture of 'one team, one community' at Roy Gomm Elementary School." ER 295. "Uniforms" are said to "foster school spirit and unity, as well as a disciplined and safe learning environment. Students will feel like they are part of a 'team' working toward the goal of academic excellence." *Id*.

Beginning in the 2011-2012 school year, RGES students were required to wear the RGES uniform: a red or navy blue "polo-style" shirt with the RGES logo

and motto and khaki or tan bottoms. ER 441,443,445,465,417,418. The shirt was purchased from RGES and bottoms could be purchased anywhere. ER 296. Students who did not comply faced progressive disciplinary action for their insubordination. ER 297-298.

On September 9, 2011, Pilling notified Mary Frudden the policy's disciplinary action would be imposed against the students if they failed to wear the mandatory uniform on September 12, 2011. ER 488,445,420.

On September 12, 2011, WCSD, its then-chief general counsel Randy Drake, and Pilling were informed the Fruddens would wear American Youth Soccer Organization (AYSO) uniforms to school in order to avoid the consequences threatened by Pilling and to continue to communicate that: (1) the policy had been implemented legally and thereby challenged the authority; (2) the mandatory uniform policy deprived them of their Constitutional right of freedom of speech and expression and freedom to parent; (3) the mandatory uniform policy compelled the students to speak a content and viewpoint-based message of "one team, one community;" and (4) the mandatory uniform policy compelled them to convey a message of group affiliation, content, group and/or viewpoint associations, and social class ("one team, one community" and "Tomorrow's Leaders"). ER 490-492,445,446,420. The Frudden students were threatened with

7

discipline, disciplined, and threatened with out-of-school suspension for their policy violations. ER 448,422.

On June 16, 2014, it was announced that "[a]s a result of the lawsuit currently pending in the United States District Court, Roy Gomm uniform shirts can no longer included the words *Tomorrow's Leaders*." ER 321.

On June 24, 2014, WCSD BOT adopted Board Policy 5105 ("BP 5105"), by which individual schools could implement mandatory school uniform policies. ER 313-319. BP 5105 grandfathered in all existing school uniform policies and expressly states: "Uniforms may have the school logo and school name. No other language shall exist on the uniforms that is not specific to the school name and mascot (i.e. 'Home of the Bears'). ER 315,318.

WCSD Administrative Regulation 5105 (AR 5105), adopted on October 6, 2014, states: "the intent of a site-based school uniform policy is to generate an effective learning environment, create and maintain a favorable school image, and promote positive self-image among students." ER 331.

## SUMMARY OF ARGUMENT

Content- and viewpoint-based speech regulations are presumptively invalid and must survive strict scrutiny, a demanding standard rarely met. The government bears the burden at all times to show the speech regulation was

constitutional. The school authorities failed to meet this burden and they were not entitled to summary judgment as a matter of law.

The MSJ evidence failed to demonstrate the motto "Tomorrow's Leaders" or the content-based exemption for uniforms of nationally recognized youth organizations served a compelling government interest achieved by a narrowly tailored means.

The MSJ evidence demonstrates the RGES uniforms were compelled in order to: restrict student expression of wealth; prevent students from forming social groups based upon their socioeconomic status; impose viewpoint-based standards of "dress for success;" exalt expression of school pride and unity over individuals; compel student association as one team, one community with a common goal; and as a medium for disseminating the government's message of "Tomorrow's Leaders."

The MSJ evidence failed to demonstrate any actual problem in need of solving at RGES with bullying or plateaued test scores as a result of student expression of disparate wealth and average income; that mandatory uniforms were necessary to prevent bullying or to boost test scores; or that Nevada's comprehensive laws on bullying and cyberbullying were insufficient to address any possible potential bullying at RGES.

9

The district court erred in preventing the Fruddens from pursuing a First Amendment claim for compelled symbolic speech based upon the uniforms in general, especially in light of the MSJ and evidence which failed to show that school uniforms served a compelling government interest which was achieved by a narrowly tailored means.

The RGES policy and school uniforms are unconstitutional and the district court erred in granting the school authorities MSJ and should have granted the Fruddens summary judgment.

The district court erred in granting the individually-named defendants qualified immunity because they waived the affirmative defense by not asserting it in any of their pleadings or previous motions and because the law regarding compelled speech and content-based regulations was clearly established.

An award of fees and costs is authorized by 42 U.S.C. §1988 should the Fruddens prevail and is not precluded by the holding in *Kay v. Ehrler*, 499 U.S. 432, 111 S.Ct. 1435 (1991).

The district court abused its discretion in excluding the Fruddens' evidence.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (*en banc*). The court, viewing the facts in the light

10

most favorable to the plaintiff, must determine whether any genuine issues of material fact exist.  *Id*.

The district court's decision to grant summary judgment on the basis of qualified immunity is reviewed *de novo*.  *Ellins v. Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013).

The district court's decision on the admissible and exclusion of evidence in a summary judgment motion is reviewed for an abuse of discretion.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *Maffei v. N. Ins. Co*., 12 F.3d 892, 897 (9th Cir. 1993); *United States v. Burreson*, 643 F.2d 1344, 1349 (9th Cir. 1981), *cert. den'd*, 454 U.S. 830, 847 (1981).  Whether evidence is properly authenticated is a question of law subject to *de novo* review.

## ARGUMENT

## I.   CONTENT- AND VIEWPOINT BASED SPEECH REGULATION IS PRESUMED UNCONSTITUTIONAL

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based."  *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 643 (1994) (citing *Burson v. Freeman*, 504 U.S. 191, 197 (1992)). "'Content-based regulations are presumptively invalid,' *R.A.V. v. St. Paul,* 505 U.S. 377, 382 (1992), and the Government bears the burden to rebut that presumption."  *United States v. Playboy Entertainment Group, Inc*., 529 U.S. 803, 817 (2000).

11

Furthermore, when the government targets "particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829 (1995) (citation omitted). Viewpoint discrimination is an "egregious form of content discrimination" and "the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*. at 829; *see also, Monterey County Democratic Central Committee v. United States Postal Service*, 812 F.2d 1194, 1198 (9th Cir.1987), cited with approval in *United States v. Kokinda*, 497 U.S. 720, 736 (1990).

That the "government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable" is a "bedrock principle underlying the First Amendment." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642 (1994) (citing *Riley v. National Federation for Blind of N. C., Inc.*, 487 U.S. 781, 798; *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 638, 640-642 (1943)).

Supreme Court precedent clearly establishes that "minors are entitled to a significant measure of First Amendment protection" and the government does not

12

have "a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. ____, 131 S.Ct. 2729, 2736 (2011). While students' constitutional rights are not "automatically coextensive" with the rights of adults in other setting, those rights are not shed at the schoolhouse gate. *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986); *Tinker v. Des Moines Independent Community School Dist*., 393 U.S. 503, 506 (1969).

The government can rebut presumptions of invalidity by showing a regulation passes strict scrutiny—there is a compelling government interest that is achieved by narrowly tailored means. *Entertainment Merchants*, 131 S.Ct. 2729, 2738 (2011) (citing *R.A.V.*, 505 U.S. at 395 (1992)). The government must specifically identify an "actual problem" in need of solving and the curtailment of free speech must be actually necessary to the solution. *Id*.

*Entertainment Merchants* recognized that strict scrutiny is a "demanding standard." *Id*. "It is rare that a regulation restricting speech because of its content will ever be permissible." *Id*., (citing *Playboy*, supra, at 818). Indeed, even California's attempt in that case to restrict children's access to violent video games depicting "killing, maiming, dismembering, or sexually assaulting an image of a human being" could not pass constitutional muster.

13

America's fierce protection of First Amendment rights evidences the core

principal that opinions and judgments, including esthetic and moral judgments,

should be formed, tested, and expressed by the individual, not the government,

"even with the mandate or approval of a majority." *Playboy*, supra, at 818.

## II.    THE SCHOOL AUTHORITIES DID NOT DEMONSTRATE THE COMPELLED MOTTO "TOMORROW'S LEADERS" SERVED A COMPELLING GOVERNMENT INTEREST BY A NARROWLY TAILORED MEANS

As this Court already determined, compelling students to bear the motto

"Tomorrow's Leaders" is compelled speech that must pass strict scrutiny to be

constitutional. *Frudden v. Pilling*, 742 F.3d at 1205 (9th Cir. 2014). The school

authorities' MSJ evidence failed to meet the heavy burden and the district court

erred in granting summary judgment to the school authorities rather than to the

Fruddens on this issue.

The MSJ makes clear the school authorities construed the "Roy Gomm

logo" as consisting of "the school mascot, a gopher, with the words 'Roy Gomm

Elementary School.'" ER 246,296. The motto "Tomorrow's Leaders" appears

"above the logo." *Id*. This distinction is important when looking at whether the

school authorities demonstrated *the motto* served a compelling interest achieved by

a narrowly tailored means.

The school authorities' *argument* was that *the motto* was included to ensure

student focus, prohibit potential bullying and prevent the purchase of "an

14

expensive brand name polo." ER 264. The district court found: "Defendants adduce the *affidavits* of former Principal Pilling and PFA members indicating that *the motto* was included to ensure that students focused on their schoolwork rather than their clothing and to prevent bullying against students from lower socioeconomic stations." ER 14-15[emphasis added].

In fact, the affidavit testimony does not speak to the inclusion of the motto at all. ER 278-280,282-284,291-293. And, the PFA's answer to Interrogatory No. 14 states:

> [I]f the students were permitted to buy their own polo shirt **without the RGES logo**, then they could potentially buy an expensive brand name polo which would distinguish the wealthy students from the average income students and may lead to social cliques, bullying, and concentration on clothing brands rather than school work.

ER 347[emphasis added]. This evidence only addresses why the "RGES logo" was included. It does not speak to or offer a reason for including "Tomorrow's Leaders." As to that, the school authorities' MSJ evidence states:

> [T]he PFA decided to include "Tomorrow's Leaders", the RGES logo, and the Gopher because the slogan "Children are 25% of our Population and 100% of our Future" has been on the front of RGES for decades. Members of the PFA and the RGES Uniform Committee, comprised of parents at the school, summarized this positive message into two words: "Tomorrow's Leaders." It was thought that "Tomorrow's Leaders" would motivate the students to be forward thinking.

15

ER 342. The PFA "believed the written words was a motivational slogan that would teach students to think about the importance of what they are doing today, and how today's academic choices can impact their future." ER 343.

In their reply brief, the school authorities raise a *different argument*. Again however, the evidence does not show the *motto* was included for those reasons. In addition, the new arguments were raised for the first time in the Reply and the Fruddens did not have the opportunity to respond. Thus the arguments and evidence should not have been considered. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003).

The school authorities did not demonstrate, indeed, did not even attempt to demonstrate, a compelling government interest for compelling students to bear the motto "Tomorrow's Leaders" or that compelling students to bear such motto was a narrowly tailored means to accomplish any asserted government interest. Since the asserted long-version of the message had been on the government's property for decades, there was no need to compel students to personally bear that message. ER 342.

The district court erred in granting the school authorities summary judgment and in failing to grant the Fruddens summary judgment on this.

16

### III. THE SCHOOL AUTHORITIES DID NOT DEMONSTRATE THE CONTENT-BASED EXEMPTION FOR UNIFORMS OF A NATIONALLY RECOGNIZED YOUTH ORGANIZATION SERVED A COMPELLING GOVERNMENT INTEREST BY THE LEAST RESTRICTIVE MEANS

The school authorities' MSJ heading states: "The RGES Uniform Policy's Incorporation of the Motto "Tomorrow's Leaders" and the Exception for Nationally Recognized Youth Organizations Served a Compelling Interest." ER 262. However, the arguments that follow do not address the exemption *at all*. ER 262-269. The school authorities simply made no attempt whatsoever to justify the exemption. *Id*.

The school authorities did not demonstrate a compelling government interest for the exemption or that it was a narrowly tailored means to accomplish any such government interest. Because the school authorities never met their initial burden (also their burden at trial), the Fruddens had no obligation to respond. Fed.R.Civ.P. 56.

Their Reply stated the exemption would "further school efficiency and organization" and, by eliminating worries over changing clothes, "the students could focus on school and attendance." ER 83, (citing to the PFA's answer to Interrogatory No. 10). However, the answer to the Interrogatory only avers to easier planning for students and parents so that "they didn't have to worry about

17

bringing two sets of clothing." ER 344. It says nothing of the *argued* purposes regarding efficiency and focus. ER 83.

Further, the Fruddens did not have the opportunity to respond to the Reply and the district court should have either refused to consider the new matters or allowed the Fruddens an opportunity to respond. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003).

The court concluded "the evidence indicates the purpose of the exemption was to aid students and parents in attending those meetings with less disruption, i.e., without having to change clothes at the end of the school day in classrooms, school bathrooms, or parents' cars." ER 21. The district court found that it would "be inclined to find that the purpose behind permitting the wear of uniforms for nationally recognized youth organizations on days that those organizations met to have been compelling." *Id*. But, it avoided the analysis and instead found the Fruddens had not shown there was a genuine issue of fact as to whether they suffered damages because of the exemption. *Id*.

In doing so, the district court erred. This Court determined the content-based exemption to be presumptively invalid and therefore the initial burden was on the school authorities to prove it survived strict scrutiny. Accepting the school authorities' explanation the exemption was an accommodation to students and parents in attending meetings of nationally recognized youth organizations after

18

school, only demonstrates its unconstitutionality and the unconstitutionality of the policy requiring uniforms to begin with.

The justification is this: The purpose of the exemption is to accommodate students and parents for after-school events because those students are more distracted, disrupted and inconvenienced by the need to change out of RGES uniforms and into their nationally recognized youth organization uniforms. If they are more distracted, disrupted and inconvenienced, they will have decreased focus and attention on school. If they have decreased focus and attention on school, they will have lower test scores. So, there is a compelling government interest in lessening the distraction, disruption and inconvenience for those students who wear uniforms of nationally recognized youth organizations.

This begs the question: Why are the members of nationally recognized youth organizations any *more* distracted, disrupted and inconvenienced than any other student who has a function to attend after school which would require him/her to change? They are not, or at least if they are, the school authorities did not provide any evidence on which this could be established.

And, assuming these distractions, disruptions and inconveniences lead to lower test scores, then the exemption does not achieve the asserted interest of boosting test scores for any student *other* than those students of nationally

19

recognized youth organizations. In this case, there is obvious viewpoint discrimination.

And, if the distraction, disruptions and inconveniences caused by the need to change from the RGES uniform into the nationally recognized youth organization uniform are so great that an exemption is needed, then the premise for the RGES uniforms (less distraction on clothing) is defeated. In this case, there is no compelling purpose for the RGES uniform and no compelling purpose for the exemption.

The clear preference the exemption provides cannot be justified by the policy itself or on the basis provided by the school authorities. For these reasons, the RGES policy is unconstitutionally content-based and must fail with the exemption.

Moreover, even under the "more" compelling interest of preventing bullying, the exemption must fail. The district court opined: "Clothing is a physical representation of that background that can present an immediately available and more tempting target for ridicule than generalized knowledge of another child's socioeconomic background." ER 18. And, the PFA was of the opinion that expensive brand name polo shirts "would distinguish the wealthy students from the average income students and may lead to social cliques, bullying, and concentration on clothing brands rather than school work." ER 347.

20

However, the school authorities failed to show how uniforms of nationally recognized youth organizations are any less expressive of socioeconomic status, less distracting, less likely to result in social cliques, or less likely to lead to bullying than regular, non-uniform clothes.

In short, uniforms of nationally recognized youth organizations can be as much of a physical representation of a child's socioeconomic status as regular, non-uniform clothes. There was no evidence that the latter is clearly more disruptive than the former. Thus, the RGES regulation is unconstitutional. *See Carey v. Brown*, 447 U.S. 455, 460–61 (1980) (Prohibition on all nonlabor picketing unconstitutional where the labor picketing excluded from the statute was equally likely to intrude on the tranquility of the home); *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 98–99 (1972).

Since the school authorities failed to satisfy strict scrutiny for the exemption, they were not entitled to summary judgment as a matter of law. Summary judgment should be granted against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Huey v. Honeywell, Inc.*, 82 F.3d 327, 334 (9th Cir. 1996) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).

And the Court erred in requiring the Fruddens to prove damages. The school authorities failed to carry their initial burden of production, so the Fruddens had no

21

obligation to produce anything. *Nissan Fire v. Fritz*, 210 F.3d 1099, 1102-1103 (2000)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)).

Additionally, nominal damages must be awarded if the plaintiff proves that his or her constitutional rights have been violated. *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978); *Cummings v. Connell*, 402 F.3d 936, 942-46 (9th Cir. 2005). The unconstitutional exemption gives rise to at least nominal damages for the Fruddens.

## IV. THE SCHOOL AUTHORITIES DID NOT DEMONSTRATE THE CONTENT- AND VIEWPOINT BASED REGULATION SERVED A COMPELLING GOVERNMENT INTEREST BY THE LEAST RESTRICTIVE MEANS

### A. THE EVIDENCE UNEQUIVOCALLY ESTABLISHED CONTENT- AND VIEWPOINT BASED REGULATION

The school authorities' MSJ evidence leaves no doubt the regulation of student expression via clothing at RGES was content- and viewpoint-based. The only justifications the school authorities make are based upon the content of student expression via their clothes.

Mimi Butler attested that her personal views about how students should "dress for success" and her views that students should "focus on their schoolwork rather than their clothing" prompted her to think about and then suggest school uniforms to other members of the PFA. ER 278-279. It was her personal observations and suppositions that, although many of RGES students "were from

22

wealthy households, there were those who could not afford expensive clothes." *Id*. Her motivation for school uniforms was to "level the playing field for those students who could not afford expensive clothes and, consequently, keep them focused on school rather than what other students were wearing." ER 279. Butler's idea for school uniforms was then presented to RGES parents. ER 278. Butler, as the president of the PFA, informed parents of all the reasons "the PFA board [is] recommending that Roy Gomm students wear uniforms," "the common arguments against school uniforms," and the PFA's response to those arguments." ER 114-115. Included was the PFA's position that it wanted students "to distinguish themselves based on who they are as a person and what they have to say rather than what clothing they are wearing" and "to realize that coming to school dressed for success is one of the most important things they do at this time of their lives." *Id*. It was the PFA's position that "[s]tudents will learn to express themselves through internal talents such as academics, singing, art, acting, and athletics [rather] than through their clothing style." ER 115. The PFA's view was that student self-expression via clothes was less valuable than expression by other means.

The matter was put to a parental vote and failed. ER 279. The PFA summarized the various comments provided by parents with the returned uniform

23

ballots which ranged from "great idea—dressed for success" and "make friends for who kids are" to "stifles expression" and "absolutely not." ER 127.

This public debate on the social and educational value of school uniforms at RGES was not put to rest despite the failed ballot results. The next year, "the issue of school uniforms" was again discussed by the PFA. ER 279. A PFA "uniform committee" was formed and a fashion show and parent information night was held. *Id*. The PFA vice-president and uniform committee chairperson, Dina Hunsberger, and Pilling, the principal, both attested they "believed that, in addition to boosting test scores, school uniforms would help even the playing field and prevent potential bullying against the new students whose families may not be able to afford some of the expensive clothing worn by their peers." ER 283,292. Again, the content of what students express via their clothes was examined.

And, once again, this public issue on the social and educational value of school uniforms was decided by a majoritarian voting process, this time with the results coming out in favor of mandatory uniforms. ER 283,293.

The PFA/uniform committee then established the mandatory school uniform, made the determination to include the motto "Tomorrow's Leaders" on the uniforms and participated in crafting the written policy, including the determination to include the exemption for uniforms of nationally recognized youth organizations. ER 445,420,333,246. That policy states in part:

24

> The main purpose of the Roy Gomm School Uniform
> Policy is to establish a culture of 'one team, one
> community' at Roy Gomm Elementary School. As such,
> uniforms serve to foster school spirit and unity, as well as
> a disciplined and safe learning environment. Students
> will feel like they are part of a 'team' working toward the
> goal of academic excellence.

ER 295. The school authorities attested "the intent of the policy was to have a

unified student body, regardless of their parents' income." ER 347.

Their evidence demonstrates the motto "Tomorrow's Leaders" was used as a

short-hand version of a "positive message" found on the school building. ER 342.

The motto was thought to be a "motivational slogan" to "teach students to think

about the importance of what they are doing today, and how today's academic

choices can impact their future." ER 343.

Finally, the school authorities' evidence demonstrates that students were

precluded from buying their own polo shirt "without the RGES logo" in order to

prevent them from buying "an expensive brand name polo which would distinguish

the wealthy students from the average income students and may lead to social

cliques, bullying, and concentration on clothing brands rather than school work."

ER 347.

On its face, the expressed "main purpose" of the policy favored student

expression of "one team, one community" to make students "feel like they are part

of a 'team' working toward the goal of academic excellence." On its face, the

"uniforms" were intended to give viewpoint-based preference for "school pride and unity." *See Jacobs v. Clark County School Dist.*, 526 F.3d 419 (9th Cir. 2008) (allowance of school logo was at least a colorable claim for impermissible content- and viewpoint-based preference for expressions of school pride).

Further, the school authorities' evidence shows the RGES regulation was aimed at student expression of wealth via their clothes in order to "even the playing field" and present a "unified" student body regardless of their parents' income. ER 347. The PFA's answer to Interrogatory No. 14 shows the regulation was aimed at student expression of wealth by way of brand-name clothes in order to prevent "social cliques, bullying, and concentration on clothing brands rather than work." "Listeners' reaction to speech is simply not a viewpoint-neutral basis for regulation." *Forsyth County v. The Nationalist Movement*, 505 U.S. 123, 134 (1992).

In addition, it cannot be overlooked that implementation of mandatory uniforms was conditioned upon a successful majority parental vote. ER 292,293,181. The matter was not without controversy as is evidenced by evidenced by the PFA's summary of the parent comments that accompanied the ballots. ER 128-129. This, in itself, evidences viewpoint discrimination because the majority viewpoint will always be given preference in matters that are controversial. "By definition, that which is 'controversial' is 'a cause of

26

disagreement,' or subject to opposing views." *Hopper v. City of Pasco*, 241 F.3d 1067, 1079, n. 12 (9th Cir. 2001) (citing and quoting Webster's Third New Int'l Dictionary, p. 1366). "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views. Access to a public forum, for instance, does not depend upon majoritarian consent." *Board of Regents of Univ. of Wis. System v. Southworth*, 529 US 217, 235 (2000); *see also Santa Fe Independent School Dist. v. Doe*, 530 US 290, 304-305 (2000) (policy which authorized principal to advise and direct high school student counsel to vote by secret ballot on whether to include an invocation was viewpoint based "doing nothing to protect the minority; indeed, it likely serves to intensify their offense.").

It cannot be disputed that, based upon the clear language of the policy and the school authorities' own evidence, the RGES regulation was content- and viewpoint based. The regulation was implemented after a majoritarian voting process, the school authorities' disclosed purposes indisputably show preferences for expression of "average income" and an intent to suppress expression of wealth, and the policy, on its face, gives preference to "team" expressions and expression of "school pride and unity."

The Fruddens argued to this Court they should have the "opportunity to develop the factual record that would show that the Policy was motivated by a desire to suppress certain ideas, or that it is unconstitutional even if it is content-

neutral." Appellant's Opening Brief at 21, *Frudden v. Pilling*, No. 12-15403 (9th Cir. June 6, 2012); *see also* Appellant's Reply Brief at 22, Frudden v. Pilling, No. 12-15403 (9th Cir. July 20, 2012). The Ninth Circuit did not make any findings regarding content-neutrality or any concession by the Fruddens. *Frudden v. Pilling*, 742 F.3d 1199 (9th Cir. 2014). It stated: "We do not suggest that the entire policy must fall if RGES's justifications are insufficient. For example, under *Jacobs*, the RGES policy clearly would survive constitutional scrutiny if the uniforms consist of plain-colored tops and bottoms. Thus, whether the written motto or the exemption passes constitutional muster are separate inquiries." *Id.* at 1208, n. 6.[1]

Thus, the policy itself must pass strict scrutiny, as well as the compelled motto and the exemption for nationally recognized youth organizations.

### B.    THE DISTRICT COURT ERRED IN DETERMINING THE POLICY AND UNIFORMS WERE CONSTITUTIONAL

The school authorities justify the mandatory uniforms by claiming they were justified in regulating student speech. But if there was no compelling government reason to regulate student speech, there could be no compelling interest in mandating uniforms. In other words, if there was no compelling government

---

[1] Under *Jacobs,* the challenged policy must be content- and viewpoint-neutral and pass intermediate scrutiny. *Jacobs*, 526 F.3d at 422, 432. These are factual inquiries, or, at the very least mixed questions of law and fact and not purely questions of law. *Id.* A content- or viewpoint-based policy is presumed invalid. *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992).

interest in preventing students from dressing in their regular, non-uniform clothes

to begin with, there could be no reason to mandate uniforms.

### 1. No Compelling Government Interest Identified by the School Authorities.

The school authorities argued there was a compelling interest in

"maintaining an effective and efficient school system" as set forth in *Ferrell v.*

*Dallas Indep. Sch. Dist.*, 392 F.2d 697, 703 (5th Cir. 1968), in "eliminating

discrimination in education and other areas" in accordance with *Grutter v.*

*Bollinger*, 539 U.S. 306, 331 (2004), and "in eliminating discrimination and

assuring its citizens equal access to education and publicly available goods and

services" as provided by *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984).  ER

263-264.  The Reply also asserts a compelling government interest in "in fostering

the growth and character of its student body."  ER 86.

The district court expressly rejected the first two asserted compelling

interests:  "Defendants misread *Grutter*" and "do not argue that there was any

discrimination to be remedied at RGES" or that "the uniform policy here increased

the diversity of the RGES student body."  ER 14.  The district court steers the

school authorities clear of *Grutter* where the Supreme Court reiterated that

"outright racial balancing" is "patently unconstitutional."  *Grutter, supra*, at 330,

(citing *Freeman v. Pitts*, 503 U.S. 467, 494 (1992) ("Racial balance is not to be achieved for its own sake").[2]

The court rejects *Ferrell* as well as "not closely on point" because "[i]t involved a dress code, not compelled speech on a uniform." ER 14. The district court did not address the third proffered interest enunciated in *Roberts* or the interest asserted in the Reply. ER 14-16.

The school authorities' inability to specifically identify the compelling interest at stake is telling—if they can't identify the specific interest, how is the court to analyze whether the government *has* an interest or whether it is compelling? The district court's rejection of *all* the asserted interests is also informative for the simple fact that, in the court's eyes, they failed to identify a compelling government interest. This should have been fatal given their burden of proof.

But, the court saved the school authorities concluding that *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 435–36 (9th Cir. 2008) and *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 391–92 (6th Cir. 2005) support their position (even though they did not cite to either case as support). ER 14,17,263-264. Confusingly, the district court's reliance on *Jacobs* and *Blau* at this juncture contradicts its earlier reason for rejecting the compelling interest asserted in

---

[2] *Grutter* is not so far removed from this case that the analogy cannot be made between racial balancing and social class balancing.

*Ferrell*: "But that case is not closely on point. It involved a dress code, not compelled speech on a uniform." ER 14.

The district court then identifies the problems at RGES by relying upon the MSJ affidavits, concluding "the purposes of the Policy were to boost test scores and to prevent bullying of children from lower socioeconomic stations." ER 16. It found "both purposes to be compelling, particularly the second." *Id.* It opined that "[c]hildren can of course be cruel to those who are different from them. In recent years. . .bullying has even led to children committing suicide. Taking measures to prevent bullying, such as mandating uniform clothing to detract from socioeconomic differences, is therefore a compelling state interest." *Id.* Further, the court concluded (albeit in the context of whether there were "actual problems" at RGES) if *Jacobs* found it "hard to think of a government interest more important than the interest in fostering conducive learning environments for our nation's children," it had "little difficulty finding that interest to be compelling." ER 17.

Even if this Court were to find the school authorities had a compelling interest to prevent bullying and increase test scores, the school authorities still did not meet their high burden of proof and were not entitled to summary judgment.

31

### 2. The District Court Erred in Finding their Were "Actual Problems" in "Need of Solving."

Simply *identifying* a compelling state is not enough. "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 664 (1994) (quoting *Quincy Cable TV, Inc. v. F.C.C.*, 768 F.2d 1434, 1455 (D.C.Cir. 1985).

In order to meet strict scrutiny (and their burden of proof) the school authorities were obligated to identify an "actual problem" in "need of solving" at RGES. *Brown v. Entertainment Merchants Ass'n*, 564 U.S. ___, 131 S.Ct. 2729, 2738 (2011) (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822-23 (2000)). The school authorities made references to "social cliques, bullying, and concentration on clothing brands rather than school work," ER 264,347, but offered no evidence to support the occurrence of any of these problems at RGES.

Citing to the rationale elucidated in *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 391–92 (6th Cir. 2005) the district court reasoned that bullying and low test scores were "'actual problems' for the purposes of a strict scrutiny analysis" "[e]ven if bullying had not yet manifested at RGES" because the school authorities could "anticipate and take measures to prevent it, and there is an

interest in maintaining or improving test scores even if they are not poor to begin with." ER 17.

The district court's reliance on *Blau* is misplaced.[3] In *Blau*, the Sixth Circuit affirmed summary judgment to the school authorities on student's First Amendment claim because there was no "speech" involved and the student *dress code*, not mandatory school uniforms, was analyzed under intermediate scrutiny because it was content- and viewpoint neutral. *Id.* at 391.

In this case, however, this Court already determined the compelled speech of "Tomorrow's Leaders" and the content-based exemption are subject to strict scrutiny. *Frudden v. Pilling*, 742 F.3d 1199, 1208 (9th Cir. 2014). Thus, the district court erred determining there were "actual problems" "in need of solving" merely because the school authorities could "anticipate and take measures to prevent [bullying], and there is an interest in maintaining or improving test scores even if they are not poor to begin with." ER 17. Such "predictive judgments" are not appropriate under strict scrutiny. *Brown v. Entm't Merchants Ass'n*, 564 U.S. ___, 131 S.Ct. 2729, 2738 (2011)(The state's "reliance on *Turner Broadcasting,* is misplaced. That decision applied *intermediate scrutiny* to a content-neutral regulation. [citation] California's burden is much higher, and because it bears the risk of uncertainty, [citation], ambiguous proof will not suffice.").

---

[3] The same is true for any reliance on *Jacobs*, *see e.g.,* ER 20, which was determined under intermediate scrutiny.

33

Under *Entertainment Merchants'* standard, which requires a showing of an

"'actual problem' in need of solving" and that "the curtailment of free speech must

be actually necessary to the solution," the school authorities' evidence surely fails.

*Entertainment Merchants*, 131 S.Ct. at 2739.

They did not show an "actual problem in need of solving." Rather, they

showed unsupported beliefs about possibilities of potential problems:

> I *anticipated* that the school would have a more
> socioeconomically diverse student body in 2010-2011
> than in years past. Based on this, I *believed* that, in
> addition to boosting test scores, school uniforms would
> help even the playing field and prevent *potential* bullying
> against the new students whose families *may not be able
> to afford* some of the expensive clothing worn by their
> peers.

ER 292 [emphasis added]. Pilling's purely subjective "beliefs" and assumptions

were nothing more than speculation. "Mere speculation of harm does not

constitute a compelling state interest." *Consolidated Edison Co. v. Public Serv.

Comm'n*, 447 US 530, 543 (1980) (citing *Mine Workers v. Illinois Bar Assn.*, 389

U.S. 217, 222-223 (1967)). Speculation and predictive judgments are simply too

capacious when it comes to strict scrutiny. The government must show more to

justify its content-based regulation. The harm in this approach is aptly illustrated in

this case.

The school authorities argued that there was "a very real threat of potential

bullying and the forming of social cliques" because "children from varying

34

socioeconomic backgrounds would be entering RGES due to the new programs put in place." ER 80. But the school authorities failed to show that the mere attendance by children from "varying socioeconomic backgrounds" was anything more than that (whatever varying socioeconomic backgrounds is), and certainly not bullying.

The district court determined that students express their socioeconomic status by their clothes--"clothing is a physical representation of that background"—and then made the assumption that students who can't express wealth will be bullied because their clothes "present an immediately available and more tempting target for ridicule than generalized knowledge of another child's socioeconomic background." ER 18. And, it found RGES had a compelling government interest in preventing bullying "[e]ven if bullying had not yet manifested at RGES" and in boosting test scores "even if they are not poor to begin with." ER 17.

Significantly, "bullying," the interest the district court found was particularly compelling, was not a reason offered by the school authorities during the time the PFA and Pilling were campaigning for uniforms. Mimi Butler's May 3, 2010 letter to Roy Gomm Parents regarding the recommendation for school uniforms at RGES for 2010-2011 does not address "bullying" as a reason for recommendation. ER 114-115. The flyer for the "School Uniform Informational Parent Meeting" states

35

that: "At this meeting, the PFA and school faculty will discuss the benefits of uniforms and address the concerns parents may have about implementing uniforms." ER116. There is no mention of "bullying." *Id*. The PowerPoint presentation delivered at the parent information meeting on April 26, 2011 makes no reference to "bullying" as a reason for school uniforms. ER 117-125. And, the April 27, 2011 follow-up letter from the "Roy Gomm Uniform Committee" to parents indicates the PFA Uniform Committee has worked diligently to research the advantages and disadvantages of uniforms and we believe that uniforms will [sic] a positive change for our school." ER 126. Again, however, there is no reference to "bullying." Also relevant, the PFA's summaries of parent comments for the unsuccessful 2010 attempt at uniforms and the 2011 successful attempt reveal that no parent made a comment regarding uniforms as a way to solve a problem of "bullying." ER 127-129.

Finally, the RGES mandatory school uniform policy itself makes no reference to "bullying" as an actual problem to be addressed by way of the policy. ER 295. *Cf. Tinker,* 393 U.S. at 509 ("Even an official memorandum prepared after the suspension that listed the reasons for the ban on wearing the armbands made no reference to the anticipation of such disruption").

A "mere expectation" that speech will cause a disruption is insufficient to justify a prohibition on speech. *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 221

36

(5th Cir. 2009). School authorities' decision to suppress student speech must be based on "fact, not intuition, that the expected disruption would probably result from the exercise of the constitutional right and that foregoing such exercise would tend to make the expected disruption substantially less probable or less severe.'" *Id*. at 221-22 (quoting *Butts v. Dallas Indep. Sch. Dist*., 436 F.2d 728, 731 (5th Cir.1971)).

The school authorities presented no evidence that bullying was actually occurring at RGES much less that bullying was occurring because of students' clothes, brand name or otherwise. The school authorities presented no admissible evidence that test scores at RGES were jeopardized—that, according to the school authorities, test scores had actually "plateaued."[4] And yet, the district court concluded:

> Defendants have satisfied their initial burden on summary judgment to present evidence that if uncontroverted at trial would entitle them to a directed verdict. They have presented evidence that the purposes of the Policy were to boost test scores and to prevent bullying of children from lower socioeconomic stations. The Court finds both purposes to be compelling, particularly the second.

---

[4] Mimi Butler attested that School Superintendent Dr. Heath Morrison "mentioned that Roy Gomm Elementary School was a good school with high test scores; however, those scores had plateaued in recent years." The Fruddens moved to strike this testimony as hearsay. ER 72. The district court denied the motion prior to any opposition by the school authorities. ER 23-24. The district court cited to Butler's testimony as evidence test scores had plateaued. ER 15.

ER 16.  Given *Entertainment Merchants* and the other cited authorities herein, this

conclusion was clearly in error.  "When First Amendment compliance is the point

to be proved, the risk of nonpersuasion—operative in all trials—must rest with the

Government, not with the citizen."  *United States v. Playboy Entertainment Group,*

*Inc.*, 529 U.S. 803, 818 (2000).  Otherwise, "we would risk leaving regulations in

place that sought to shape our unique personalities or to silence dissenting ideas."

*Id*.

### 3.    Determination of Narrowly Tailored

In addition to showing there is a compelling governmental interest (actual

harm in need of solving) the school authorities had the burden to prove the

restriction on student expression was narrowly tailored. Thus, they had to show

that restricting students' free expression and compelling them to wear the RGES

school uniforms (including the RGES logo and motto) was actually necessary for

the prevention of bullying and to boost test scores and the RGES school uniform

was the least restrictive means of achieving those interests.  *Entertainment*

*Merchants*, 564 U.S. ___, 131 S.Ct. 2729, 2738 (2011); *Playboy*, 529 U.S. 803,

813 (2000) (Narrowly tailored requires "the least restrictive means to further a

compelling governmental interest.").

The district court found "it would be sufficiently difficult to avoid a child

drawing inferences of another child's socioeconomic background by other means if

the children were permitted to wear clothing chosen and purchased by their parents that differed in quality (or at least in price) based on the brand." ER 17. "Clothing is a physical representation of that background that can present an immediately available and more tempting target for ridicule than generalized knowledge of another child's socioeconomic background." ER 18.

In fact, the school authorities' evidence shows mandatory uniforms were not necessary to prevent students being targets for ridicule. Butler attested she noticed in 2009-2010 "many of the students at Roy Gomm Elementary School were from wealthy households" and "there were some students that could not afford expensive clothing." ER 278-279. Pilling attested she anticipated RGES would have a more socioeconomically diverse student body in 2010-2011 than in years past. ER 292. According to these affiants, RGES students' clothes already presented an "immediately available and more tempting target for ridicule" in the 2009-2010 and 2010-2011 school years. ER 18. Yet, the school authorities presented *no* evidence that RGES students were ridiculing or being ridiculed based upon that physical representation of their socioeconomic background. Additionally, they presented *no* evidence test scores had been "boosted" in the four years since implementation of the policy.

The complete absence of such evidence directly undermines the school authorities' argument that regulation of student expression of wealth was *necessary*

39

to prevent bullying and increase test scores. Moreover, the fact that uniforms were implemented only *after* a "successful" ballot measure, ER 280, undermines the *argument* that uniforms were *necessary* to prevent bullying and increase test scores.

According to the district court's reasoning, the government can regulate *inferences* that students might make when they look at one another. ER 17-18. But students make inferences about other "physical representations" that are "immediately available" and "tempting targets for ridicule," i.e., sexuality, gender, weight, height, hair color, handicap. Yet, these physical representations could not provide the basis for broad, prophylactic government regulations suppressing one or more of these physical representations merely because it might be the target of ridicule, at least not without some evidence that the particular physical representation caused some actual problem. If the purpose were merely to prevent bullying, the policy could have been: "Anyone who ridicules a student based upon his/her clothes (sexuality, gender, weight, height, hair color, handicap, etc.) will be subject to progressive disciplinary action, including suspension."

In fact, Nevada's comprehensive laws on school bullying, including cyber-bullying, are aimed at the very conduct the school authorities claim to be addressing, including exploiting an imbalance in power and conduct that creates an environment which is hostile to a pupil by interfering with the education of the

40

pupil.  *See e.g.,* NRS 388.121 *et seq.*; NRS 392.915.  Surely these laws are more than sufficient to address any incidents of bullying without chilling the speech of all innocent students.  But the school authorities did not address that.

Additionally, as a means "leveling the playing field" (if, indeed, constitutionally permissible in this manner),[5] the RGES policy fell far from the mark because the regulation was vastly underinclusive.  Remarkably, the RGES mandatory school uniform policy clearly left wide open the expression of wealth/socioeconomic status by the mere fact the "wealthy" students could have multiple sanctioned-shirts, in both red and blue, and could replace torn, stained, worn-out, or outgrown shirts at any time.  Furthermore, the "wealthy" could still flaunt their wealth, if you will, via the brand, price, logo, quantity, quality of the other clothing mandated or permitted under the RGES mandatory school uniform policy, as well as with jewelry, hair accessories, cell phones, backpacks, purses, shoes, etc. none of which fell under the regulation.

That students were permitted to express their wealth in so many other ways, and in ways that are equally "representative" of their socioeconomic status as brand name polo shirts are, indicates the regulation is underinclusive.  No one could seriously conclude that mandating a RGES mandatory uniform shirt with the

---

[5] *See Grutter v. Bollinger*, 539 U.S. 306 (2004); *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976)("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.").

41

RGES logo and motto, while leaving so many other means of socioeconomic expression open, could possible achieve the asserted purpose of "leveling the playing field." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546–47 (1993)("Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling").

The RGES mandatory school uniform policy was overinclusive as well, restricting all student speech recognized in *Jacobs v. Clark County School Dist*., 373 F.Supp.2d 1162, 1172 (D.Nev. 2005) *i.e.,* pure speech, group affiliation, religion, political affiliation, group or viewpoint association, a challenge to authority, sexuality, defiance of stereotypes, demonstration of acquiescence in the prevailing order, and conformance with prevailing stereotypes—for the admitted purpose of regulating expression of wealth/socioeconomic status. For a law to be narrowly tailored, "government must curtail speech only to the degree necessary to meet the particular problem at hand" and "must avoid infringing on speech that does not pose the danger that has prompted regulation." *Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n*, 518 US 604, 641 (1996).

Recently, the Supreme Court reiterated that strict scrutiny requires the regulation be narrowly tailored to advance the government's compelling interest

42

through the least restrictive means. *Williams-Yulee v. Florida Bar*, S.Ct. No. 13-1499 (April 29, 2015) (citing *United States v. Playboy Entertainment Group, Inc.*, 529 U. S. 803, 813 (2000)). The district court, however, opined: "Defendants are not required to have used the least restrictive means of serving those purposes but only 'narrowly tailored' means, as noted by the Court of Appeals. *See Frudden*, 742 F.3d at 1207." ER 20-21.

*Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1038, n. 4 (9th Cir. 1999), cited by *Frudden*, at 1207 cites to both *Wooley v. Maynard*, 430 U.S. 705 (1977) and *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943) which required strict scrutiny where personal speech was compelled.

In *Wooley*, the Court said: "[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, at 717. And, in *Barnette*, the Court said:

> Words uttered under coercion are proof of loyalty to nothing but self-interest. Love of country must spring from willing hearts and free minds, inspired by a fair administration of wise laws enacted by the people's elected representatives within the bounds of express constitutional prohibitions. These laws must, to be consistent with the First Amendment, permit the widest toleration of conflicting viewpoints consistent with a society of free men.

43

*Barnette,* at 644. *Frudden's* citation to *Rounds* signaled its intent that the government's compelling interest had to be achieved by the least restrictive means. Anything less would be inconsistent with *Wooley* and *Barnette.*

And this is exactly what happened. The district court determined "including the gopher mascot and the motto on the uniforms was narrowly tailored to serving" the "compelling purpose" "to detract from socioeconomic differences between students that varied clothing could highlight." ER 20. Omitting the mascot and motto could have "permitted students to wear clothing of differing quality or price, thereby undermining one of the compelling purposes of adopting the uniform dress." *Id*. Notably, the court concludes the motto could have been omitted, but its inclusion "did not render the Policy constitutionally infirm for failure of narrow tailoring" because "First Amendment rights are not as extensive in the school context as in broader society" and the motto is not "political in nature" which is "the most closely protected speech." ER 21.

The district court's reasoning cannot be upheld. First, it is not accurate to state political speech it the most closely protected. The Supreme Court recently quoted the Second Court of Appeals in affirming the judgment—"The First Amendment protects even dry information, devoid of advocacy, political relevance, or artistic expression." *Sorrell v. IMS Health Inc*., ___ U.S. ___, 131 S.Ct. 2653, 2666-67 (2011) (internal quotation marks and alteration omitted by

44

Court)).  Second, the district court's analysis is contrary to the holding of this

Court and flies in the face of clear, established Supreme Court precedents.  It

strikes a heavy blow at principles well-established in *Entertainment Merchants*,

*Wooley, Barnette* and *Tinker*, to name but a few.  If the district court's decision is

left to stand, then:

- Instead of actual harm in need of solving, school authorities can use their

  predictive judgment to anticipate a possibility of potential harm and then

  claim it needs solving;

- Instead of curtailing speech because, without doing so, there will be no

  solution, school authorities can find a solution that enables them to curtail all

  speech;

- Instead of permitting individuals to speak their own message or not to speak

  any message at all, school authorities can make all students speak the same

  government message so no harmful inferences can be made;

- School authorities can do all of this because public school students' rights

  are automatically less than everyone else's.

- And, one form of fully protected speech is *more* fully protected than any

  other.

  It is clear, this decision cannot stand.

45

In the present case, school authorities admittedly regulated students' expression of wealth when there was not even an iota of evidence that expression of wealth resulted in bullying or that suppression of wealth decreased bullying. More specifically in this case, there was no evidence a mandatory school uniform policy that suppressed students' preferred messages and advanced the government's preferred messages of school spirit and team unity as well as "Tomorrow's Leaders" was a necessary means to achieve a bully-free school. And, there was no showing whatsoever, and no finding by the district court, that student expression of his or her wealth resulted in "plateaued" test scores.

Moreover, while the school authorities identified certain government interests, they did not present any evidence on which to find a compelling government interest, least of all a compelling government interest which was remedied by the use of the motto "Tomorrow's Leaders." The testimony of Butler, Hunsberger and Pilling addresses why *uniforms* were mandated, it offers nothing to support the contention the motto served a compelling government interest.

"[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Abood v. Detroit Bd. of Ed.*, 431 US 209, 235 (1977) (citing *Elrod v. Burns*, 427 U.S. 347, 356-357 (1976)(plurality opinion). *Abood* reaffirmed that "freedom of belief" is

46

not an "incidental or secondary aspect of the First Amendment's protections," rather it is a core aspect of the First Amendment. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id*. (quoting *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642).

## V. THE FRUDDENS' COMPELLED SPEECH CLAIM REGARDING SCHOOL UNIFORMS IN GENERAL

In *Frudden v. Pilling*, 742 F.3d 1199, 1208 (9th Cir. 2014), the Ninth Circuit reversed dismissal of the Fruddens' First Amendment claims and directed the district court to review the motto and the content-based exemption under strict scrutiny. Because it found the motto to be compelled speech, the Ninth Circuit did "not address whether the Fruddens can state a compelled speech claim based, without more, on the school logo (i.e., the 'stylized gopher' with the words 'Roy Gomm Elementary School')." *Id*. at 1205, n. 2.

The district court found: "At oral argument on appeal, Plaintiffs' counsel more than once conceded that a motto-less uniform without the content-based exemption for nationally recognized youth organizations would be unobjectionable under *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419 (9th Cir. 2008) and that Plaintiffs did not object to the gopher mascot." ER 26. For these reasons, the district court concluded that "[t]he claims based on the bare fact of the uniforms

47

was not preserved on appeal (and was in fact conceded at oral argument), and it is therefore not before the Court after remand." ER 26-27.

Even if such a concession were made, which the Fruddens deny, it does not foreclose their claim the RGES uniforms in general are unconstitutional. Based upon the MSJ evidence, the RGES regulation was content- and viewpoint-based and the intermediate scrutiny test relied upon in *Jacobs* is entirely inapplicable to both to the policy and the uniform.

The Ninth Circuit did not rule out the possibility that "there are times when 'wearing a uniform is expressive, identifying the wearer with other wearers of the same uniform, and with the ideology or purpose of the group.'" *Jacobs v. Clark County School Dist.*, 526 F.3d 419, 438 (9th Cir. 2008)(quoting *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 206 (2nd Cir. 2004)).

In this case, the RGES mandatory uniforms are more than the "solid-colored tops and bottoms" assessed and rejected in *Jacobs* as symbolic, expressive speech. The distinctive nature of the RGES uniforms and the factual context in which they are worn demonstrate the RGES uniforms are intended to be expressive of the government's messages (both pure and symbolic).

A "uniform," by definition, bespeaks affiliation and/or association with some particular group. A "uniform" is defined as "dress of a distinctive design or fashion adopted by or prescribed for members of a particular group and serving as

48

a means of identification." Webster's Third New Internat. Dict. (1986), p. 2498. Something is "distinctive" if it "serves to distinguish, or sets something apart from others, or if it is characteristic of or peculiar to its type." *See id*. p. 659.

The RGES uniform shirt, in fact, contained very distinctive qualities, features and designs. The shirt is limited in style, design, color, brand, quality and price. ER 296. The name of the school, a stylized image of a gopher (the school mascot) and the motto "Tomorrow's Leaders" all appear on the front of the shirt. ER 296,417,441. While an image of a gopher itself may not have any particularized meaning, the school authorities described the gopher as the school mascot. ER 246.[6] As a mascot, the gopher image takes on a more specific and significant meaning. "Mascot" is defined as "a person, animal, or object adopted by a group as a symbolic figure esp. to bring them good luck." Webster's Third New Internat. Dict. (1986), p. 700; *See e.g., Crosby by Crosby v. Holsinger*, 852 F.2d 801, 802 (4th Cir. 1988)("A school mascot or symbol bears the stamp of approval of the school itself."); *see also, Crue v. Aiken*, 370 F.3d 668 (7th Cir. 2004)(First Amendment concerns over mascot/symbol of the university).

The school name, mascot and motto appear in a distinct composition on the left front side of the shirt (which, when worn would be approximately positioned over the heart). ER 465,461,441,417. Large banners containing same image and

---

[6] The same stylized gopher image is used on RGES letterhead, ER 321 and on a letter written by Mimi Butler as the PFA president. ER 114.

49

words in in the same distinct composition were posted at RGES.  ER 442,418.

Like the uniform shirt colors, half the banner is red and half is navy blue.   ER *Id.*

The words "One Team One Community" appear at the top in white.  *Id.*

> Notably, the RGES Policy expressly states:

> > The main purpose of the Roy Gomm School Uniform
> > Policy is to establish a culture of 'one team, one
> > community' at Roy Gomm Elementary School.  As such,
> > uniforms serve to foster school spirit and unity, as well as
> > a disciplined and safe learning environment. Students
> > will feel like they are part of a 'team' working toward the
> > goal of academic excellence.

ER 295.

The motto "Tomorrow's Leaders" was used as a short-hand version of a "positive message" found on the school building.  ER 342.  The motto was thought to be a "motivational slogan" to "teach students to think about the importance of what they are doing today, and how today's academic choices can impact their future."  ER 343.

The RGES uniforms, policy, banners and the government's motivating ideology are unquestionably linked.  The school authorities attested "the intent of the policy was to have a unified student body, regardless of their parents' income." ER 347.

The uniform could "not be altered in any way" and students were "required to wear the school uniform" "during Roy Gomm's official school hours," "formal

class activities immediately before or after school," and "[e]vening activities outside the official school day" "subject to the requirement of the teacher in charge of the activities." ER 296. Optional sweatshirts were available in red or navy blue which also contained the same composition. *Id.* Students were permitted to "wear a coat over their uniform on cold days while outside at recess" but were required to remove it "[u]pon returning to the classroom." *Id.*

All students enrolled at RGES Students were free to wear non-uniform clothes on days designated as "free dress/spirit wear" days, field trips designated as "free dress" or when on campus outside of normal school hours. ER 297. Uniforms of nationally recognized youth organization such as Boy Scouts or Girl Scouts on regular meeting days were permitted. *Id.*

The RGES uniform is a distinct style with a unique design, containing clearly identifying school information as well as and the asserted "motivational" motto of "Tomorrow's Leaders." Thus, unlike Jacobs, where the "uniforms" were "nothing more than plain-colored tops and bottoms," the distinctive uniform and pure speech messages contained thereon, in conjunction with the language of the policy itself, the prominent banners, and the school authorities' admissions, all demonstrate the RGES uniform was intended to be symbolic expression (containing pure speech).

51

Given the factual context, the environment and the nature of hundreds of children wearing nearly-identical uniforms, it is not reasonable to assume the RGES uniform was used for any other purpose than as symbolic expression. If the passive wearing of the silent symbol of plain black armbands can be "akin to pure speech," under the circumstances of this case the RGES uniform can certainly be considered "akin to pure [compelled] speech." *Tinker v. Des Moines Indep. Comm. Schl. Dist.*, 393 U.S. 503, 505 (1969).

The undeniable intent was that the uniform, in general, operate as a symbolic message of a unified school of one team, one community with school spirit and unity working together toward a common goal of academic excellence as "Tomorrow's Leaders." *See Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1059 (9th Cir. 2010) ("[T]attooing is purely expressive activity rather than conduct expressive of an idea, and is thus entitled to full First Amendment protection without any need to resort to *Spence's* 'sufficiently imbued' test.").

The First Amendment includes "the right to associate with others for the purpose of advancing ideas" and "to refuse association with those who articulate contrary views." *Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1036 (9th Cir. 1999). An individual's right to autonomy is threatened when he/she is forced to disseminate a view that is contrary to their own, and this is especially so where the one compelled is "intimately connected with the communication

52

advanced." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 566 (1995). The district court erred in ruling the Fruddens could not pursue a claim against the RGES uniforms in general.

It may be that a majority of families at RGES do not object to RGES uniforms as a showing of "One Team, One Community" "Tomorrow's Leaders" and may see it as motivating, inspirational and effective in promoting school pride and unity. Indeed, the Nazi propaganda slogan "Ein Volk, ein Reich, ein Führer" ("One People, One Nation, One Leader") was "used to great effect in 1938." [7] "'Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine.'" *Brown v. Entertainment Merchants Ass'n*, 131 S.Ct. 2729, 2732 (2011)(quoting *Winters v. New York*, 333 U.S. 507, 510 (1948)). However, the Fruddens object to being compelled to bear the government's message via mandatory school uniforms, especially where, as here, the uniforms fail to serve a compelling government interest in the least restrictive means.

The MSJ was directed at the constitutionality of the RGES uniforms in general with no attempt to justify the motto independently from the uniforms in

---

[7] *See* "Nazi Propaganda" by Professor David Welch http://www.bbc.co.uk/history/ worldwars/wwtwo/nazi_propaganda_gallery_03.shtml last updated 2011-02-17 accessed 16 June, 2015.

general. Rather, the MSJ evidence shows the RGES uniform provided the medium for the motivational slogan.[8]

## VI.    QUALIFIED IMMUNITY IS NOT AVAILABLE

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S.Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The school authorities waived the defense by their failure to plead it. Fed.R.Civ.P. 8(c).

The district court found there was no "clearly established right against the compelled wearing of a school motto on an elementary school uniform or against a uniform exception for nationally recognized youth organizations when those organizations meet." ER 11-12. The court construed the right too narrowly. "We

---

[8] Cf. *Riley v. Nat'l. Fed'n. of the Blind of N.C.*, 487 U.S. 781, 796 (1988)(When commercial speech is "inextricably intertwined with otherwise fully protected speech," the entirety of the intertwined speech is treated as fully protected expression).

do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 131 S.Ct. at 2083. In fact, "even if there is no closely analogous case law, a right can be clearly established "on the basis of 'common sense.'" *Giebel v. Sylvester,* 244 F.3d 1182, 1189 (9th Cir. 2001)(citing *DeBoer v. Pennington*, 206 F.3d 857, 865 (9th Cir. 2000), petition for cert. filed, (U.S. Aug. 7, 2000) (No. 00-222)).

"The Supreme Court has consistently tried to make it clear that the First Amendment protects the rights of all persons to proclaim their views for all to hear without interference by the state." *Id*.

More than seventy years ago, in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), the Supreme Court explained that public elementary school students[9] could not be compelled to affirm by words and acts that which they did not believe. The compulsion there was for school children to regularly salute and pledge allegiance to the flag of the United States with failure to conform considered an action of "insubordination" resulting in expulsion. *Id*. at 626-29. *Barnette* made it abundantly clear that authorities do not have the constitutional right to select appropriate means for "national unity." *Id*. at 642.

---

[9] *Morgan v. Swanson*, 659 F.3d 359, 386 (5th Cir. 2011) (en banc) (noting that *Barnette* involved elementary school students); *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 417 (3d Cir. 2003) ("For over fifty years, the law has protected elementary students' rights to refrain from reciting the pledge of allegiance to our flag.") (citing *Barnette*).

This case is within the clear contours of *Barnette*. RGES students were compelled to "establish a culture of 'one team, one community' by wearing mandatory school uniforms containing the RGES logo and motto "Tomorrow's Leaders," which uniforms were expressly said to "serve to foster school spirit and unity." That this case was for the purpose of compelling "school unity" instead of "national unity" makes no difference.

Furthermore, *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969) makes clear students retain their rights to free speech, and *Wooley v. Maynard*, 430 U.S. 705 (1977) established that citizens cannot be compelled to bear the government's message on their private property.

*Jacobs v. Clark County School Dist.*, 526 F.3d 419 (9th Cir. 2008) did not alter these Supreme Court precedents. These closely analogous cases and common sense put the rights at issue here well within the realm of "clearly established." This Court recognized as much: "The 'right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.'" *Frudden v. Pilling,* 742 F.3d 1199, 1203 (9th Cir. 2014) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34 (1943)); and *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) (stating

56

that "freedom of speech prohibits the government from telling people what they must say")).

"Anyone who acts on behalf of the government should know that a person has a constitutional" First Amendment right of free speech. *See Devereaux v. Abbey*, 263 F.3d 1070, 1084 (2001) (J. Kleinfeld concurring in part, and dissenting in part) (regarding the constitutional right not to be "'framed.'").

## VII. ATTORNEY'S FEES SHOULD BE ALLOWED TO THE FRUDDENS AS A PREVAILING PARTY

The district court preliminarily concluded: "an award of attorneys [*sic*] fees would probably not be appropriate under 42 U.S.C. § 1998(b) [*sic*]."). ER 29. The MSJ requested costs and fees be denied the Fruddens. ER 269-270. The court ruled the issue was unripe. ER 23.

Pursuant to 42 U.S.C. §1988, the court in its discretion, may allow the prevailing party in a civil rights action reasonable attorney's fee as part of the costs. "[A] request for attorney's fees under § 1988 raises legal issues collateral to" and "separate from" the decision on the merits. *White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445, 451-52, (1982). A "request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

Mary Frudden's representation of Jon Frudden and the minor children satisfies the *per se* rule announced in *Kay v. Ehrler*, 499 U.S. 432 (1991). A

57

successful civil rights plaintiff may recover reasonable attorney's fees for legal services performed by the plaintiff's attorney-spouse as part of the costs under §1988. *Rickley v. Cty of Los Angeles*, 654 F.3d 950, 956 (9th Cir. 2011). The attorney's fee provision in 42 U.S.C. §1988 is not "a general rule requiring counsel to be independent and emotionally detached" and "[n]either the Supreme Court nor [the Ninth Circuit] has ever adopted such a rule." *Id*. at 955; *See also*, *Weissberg v. Lancaster School Dist*., 591 F.3d 1255 (9th Cir. 2011)(Attorney's fees awarded for legal services by attorney-grandmother); *Collins v. Chandler Unified School Dist.*, 644 F.2d 759 (9th Cir. 1981)(Successful parent suing on behalf of her minor child was entitled to attorney's fees under 42 U.S.C. §1988 absent a showing of "special circumstances.").

Accordingly, the Fruddens request a ruling from this Court which would provide the district court guidance on the issue of attorney's fees pursuant to §1988 so that it does not result in a second major litigation.

## VIII. THE COURT ABUSED ITS DISCRETION IN EXCLUDING THE FRUDDENS' EVIDENCE

The school authorities did not object to any of the evidence submitted by the Fruddens. ER 78-98; *see* Fed.R.Civ.P. 56(c)(2). The district court excluded all but Jon Frudden's Declaration. ER 18-20.

Neither *DiMartino v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark*, 66 P.3d 945, 946–47 (Nev. 2003) nor Rule 3.7 of the Rules of Professional Conduct

disqualify Mary Frudden as a witness. *DiMartino* and the language of the Rule demonstrate that a lawyer is permitted to act as advocate at a trial in which the lawyer is likely to be a necessary witness if disqualification of the lawyer would work substantial hardship on the client. Mary Frudden's Declaration attests that prior to filing the original Complaint and after that time, Ms. Frudden had tried unsuccessfully to enlist other lawyers to represent her, Jon Frudden and their minor children. ER 210. Her Declaration was made upon personal knowledge, under penalty of perjury. *Id*. Accordingly, her Declaration was admissible under Rule 56(c)(4) to show that her disqualification would work a substantial hardship.

Documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(c)(4)) and the affiant must be a person through whom the exhibits could be admitted into evidence. *See* 10A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2722 at 58-60 (2d ed. 1983). A competent witness with personal knowledge can authenticate documents attached to an admissible declaration. Fed.R.Evid. 901(b)(1). An attorney can submit an affidavit when she is competent to testify to facts within her personal knowledge. 6 Moore's Federal Practice ¶ 56.22[1] (2d ed. 1980); *Lockwood v. Wolf Corp*., 629 F.2d 603 (9th Cir. 1980). Here, Mary Frudden's Declaration was sufficient and the documents could be admitted through her at the time of trial, thus they should not

have been excluded. ER 210-211; *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1551 (9th Cir.1990).

In addition, most of the documents may have been admitted through Jon Frudden. Mr. Frudden is the father of the minor children and was a recipient of all the documents which originated from RGES and the PFA, which included, Exhibits 6-10, 14, and 16. ER 111-113. Further, Exhibit 19 was sent to and received at the Fruddens' house, thus Mr. Frudden could authenticate that document. ER 198-199. He was a "competent witness with personal knowledge" who could have authenticated many of the documents, and thus they should have been admitted, at least for purposes of determining summary judgment. *Id.*; *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir.); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). When evidence is not presented in an admissible form in the context of a motion for summary judgment, but it may be presented in an admissible form at trial, a court may still consider that evidence. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir.2003) (citing *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir.2001)).

Documents produced in discovery are considered authentic if there is some indication the documents are what they say they are and there is no substantive challenge to their authenticity. *See Maljack Productions, Inc. v. GoodTimes Home*

60

*Video Corp.*, 81 F.3d 881, 889 (9th Cir. 1996). In this case that would include exhibits 1, 12, and 15. ER 99-110,134-146,169-178.

Exhibit 11, which the court indicates is "a newspaper or magazine article concerning school uniform policies" was self-authenticating and admissible under FRE 902(6). ER 130-133. This document is particularly important as it directly refutes the school authorities' contentions regarding the need for mandatory school uniforms.

Finally, a proper authentication for the exhibits could rest on any manner permitted by FRE 901(b), including the distinctive characteristics such as "appearance, contents, substance, internal patterns" "taken together with all the circumstances." FRE 901(b)(4); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

The evidence should not have been excluded by the court.

## CONCLUSION

The government cannot constitutionally suppress students' speech and compel them to bear the government's preferred messages where there is nothing but an undifferentiated fear or apprehension of disturbance. This Court should reverse the district court's grant of summary judgment in favor of the school authorities and direct judgment be entered in favor of the Fruddens as a matter of law. The case should be remanded for a trial on damages.

61

## STATEMENT OF RELATED CASES

The Fruddens state that the following case was previously heard in this Court which concerns the case being briefed:

*Frudden v. Pilling*, No. 12-15403 on appeal from motion to dismiss and resulting Opinion *Frudden v. Pilling*, 742 F.3d 1199 (9th Cir. 2014)

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed.R.App.P. 32(a)(7)(B) because the brief contains 13,944 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman typeface.

Dated: June 18, 2015

> s/ Mary Frudden, Esq.
> Counsel for Plaintiffs-Appellants
> Jon E. Frudden On behalf of his
> Minor Children, John Doe and Jane
> Doe

63

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing EXCERPTS OF RECORD with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 18, 2015.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system including:

Sara Almo
Counsel for Defendants

Dated: June 18, 2015

> s/ Mary Frudden, Esq.
> Counsel for Plaintiffs-Appellants
> Jon E. Frudden On behalf of his
> Minor Children, John Doe and Jane
> Doe